RODNEY J. LEGGETT (SBN 332119)
rleggett@housingrightscenter.org
ZACHARY FREDERICK (SBN 333738)
zfrederick@housingrightscenter.org
JAVIER BELTRAN (SBN 240416)
jbeltran@housingrightscenter.org
**HOUSING RIGHTS CENTER**
3255 Wilshire Boulevard, Suite 1150
Los Angeles, CA 90010
Tel.: (213) 387-8400 x1114

CHRISTOPHER BRANCART (SBN 128475)
**BRANCART & BRANCART**
cbrancart@brancart.com
Post Office Box 686
Pescadero, CA 94060
Tel.: (650) 879-0141

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

| | |
|---|---|
| DESMOND MOORE; DEANTIERA MCKNIGHT; ADAM VICKMAN; and LOVIE WHITE,<br><br>Plaintiffs,<br><br>vs.<br><br>401 SEA BREEZE APTS LLC, a Delaware Limited Liability Company; GGE MANAGEMENT, LLC, a California Limited Liability Company; PATRICK ELKIN; and LUIS REYES,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND MONETARY RELIEF** |

1. Plaintiffs—four prospective tenants—sue the owners, operators, and managers of the Sea Breeze Apartments in Redondo Beach for housing discrimination in violation of the federal Fair Housing Act ("FHA") and California Fair Employment and Housing Act ("FEHA"), among other statutes.

## I. JURISDICTION AND VENUE

2. This Court has jurisdiction over this case pursuant to 42 U.S.C. § 3613(a) and 28 U.S.C. § 1331 in that the claims alleged arise under the federal Fair Housing Act. This court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear and determine Plaintiffs' state law claims because those claims are related to Plaintiffs' federal law claims and arise out of a common nucleus of related facts. Plaintiffs' state law claims are related to Plaintiffs' federal law claims such that those claims form parts of the same case or controversy under Article III of the United States Constitution.

3. Venue is proper in this district under 28 U.S.C. § 1391(b) and (2) because all events giving rise to this Complaint occurred in the County of Los Angeles.

## II. PARTIES

4. Plaintiff Desmond Moore, a Los Angeles County resident, is African American. After obtaining a Section 8 Housing Choice Voucher ("Section 8 voucher") from the Redondo Beach Housing Authority ("RBHA"), Moore attempted to rent a dwelling at the Sea Breeze Apartments, but Defendants refused to rent to him pursuant to their "No Section 8 Policy."

5. Plaintiff DeAntiera McKnight, a Los Angeles County resident, is African American. After obtaining a Section 8 voucher from RBHA, McKnight attempted to rent a dwelling at the Sea Breeze Apartments, but Defendants refused to rent to her pursuant to their "No Section 8 Policy."

6. Plaintiff Adam Vickman, a Los Angeles County resident, is African American. After obtaining a Section 8 voucher from RBHA, Vickman attempted to

rent a dwelling at the Sea Breeze Apartments, but Defendants refused to rent to him pursuant to their "No Section 8 Policy."

7. Plaintiff Lovie White, a Los Angeles County resident, is African American. After obtaining a Section 8 voucher from RBHA, White attempted to rent a dwelling at the Sea Breeze Apartments but Defendants refused to rent to her pursuant to their "No Section 8 Policy."

8. Defendant 401 Sea Breeze Apts LLC, a Delaware limited liability company, owns the Sea Breeze Apartments, a 56-unit rental property located at 401-407 Avenue G, Redondo Beach, CA 90277.

9. Defendant GGE Management LLC, a California limited liability company, operates the Sea Breeze Apartments on behalf of Defendant 401 Sea Breeze Apts LLC.

10. Defendant Patrick Elkin is the general manager of GGE Management LLC and responsible for the operation, policies, and practices of GGE Management LLC.

11. On information and belief, Plaintiffs allege that Elkin determined, directed, or ratified the unlawful housing practices alleged in this Complaint in his personal capacity as well as a corporate officer of Defendant GGE Management LLC.

12. Defendant Luis Reyes, a GGE Management employee, managed the Sea Breeze Apartments on behalf of Defendants.

13. Each Defendant was the agent, principal, and co-conspirator of every other Defendant. Each acted within the course and scope of their authority in committing the discriminatory housing practices alleged in this Complaint.

14. As a result of their relationship, conduct, and authority, each Defendant is directly or vicariously liable for each unlawful housing practice alleged in this Complaint as follows:

a. for the Defendant's own conduct;

b. for failing to take prompt action to correct and end an unlawful housing practice by that Defendant's employee or agent, where the Defendant knew or should have known of the unlawful conduct;

c. failing to take prompt action to correct and end an unlawful housing practice by a third-party, where the Defendant knew or should have known of the unlawful conduct and had the power to correct it; and,

d. each Defendant is also vicariously liable for unlawful conduct by the Defendant's agent or employee, regardless of whether the Defendant knew or should have known of the conduct that resulted in the unlawful housing practice, consistent with agency law.

## III. FACTUAL ALLEGATIONS

### A. Section 8 Housing Voucher Program

15. The Housing Choice Voucher program is the federal government's largest housing subsidy program, serving over 2.2 million low-income households comprising some 5.3 million individuals. Created by the 1974 Housing and Community Development Act, the program is commonly called "Section 8" after the provision in that statute authorizing it. Under the Section 8 program, assisted families contribute some amount toward their rental payments—generally between 30% and 40% of their income—with the government paying the balance up to a certain amount. The program is funded by HUD, but administered by local public housing authorities. In Redondo Beach, the public housing authority responsible for administration of the Section 8 voucher program is the Redondo Beach Housing Authority ("RBHA").

16. Demand for Section 8 vouchers is extremely high. Housing authorities place qualified applicants on a waiting list. Because the demand for vouchers far

exceeds the supply of vouchers administered, the wait for a Section 8 voucher administered by RBHA is typically 80 months.

17. When an applicant is finally selected off of the waitlist, a voucher holder or recipient must apply to rent and be accepted for tenancy by a private landlord. To effectuate a Section 8 tenancy, the voucher holder and the landlord must execute a written lease agreement, and the landlord and local housing authority must execute a Housing Assistance Payment ("HAP") contract. Under the HAP contract, the housing authority pays a portion of the rent directly to the landlord.

18. Once an applicant obtains a Section 8 voucher, they must use it or lose it—Section 8 vouchers must be placed with a landlord within 60 days of issuance unless the housing authority grants an extension. If the applicant does not obtain housing during this time, the voucher will expire. Once the voucher expires, the applicant must start the entire process over from the beginning by signing up for the waitlist again the next time it opens. It may be many years before the waitlist re-opens—as of the date of this filing, it has been nine years since the RBHA waitlist last opened.

## B. Defendants' Pattern or Practice of Housing Discrimination

19. Since at least August 1, 2023, Defendants have engaged in a pattern or practice of housing discrimination pursuant to their "No Section 8 Policy." Under their stated policy, Defendants refuse to rent to Section 8 voucher holders and refuse to consider the rental applications of Section 8 voucher holders.

### 1. Desmond Moore

20. Desmond Moore is a 47-year-old African American person with a disability.

21. Mr. Moore lives on a fixed income. He has struggled to make ends meet and has been homeless since 2022. While he can sometimes sleep at a family member's house, when that option is unavailable he sleeps in a car.

///

22. Mr. Moore sat on RHBA's Section 8 waitlist for eight years before RBHA issued him a Section 8 voucher in July 2023.

23. Mr. Moore was relieved to finally receive a voucher. Because Mr. Moore lives on a limited income, this voucher would have allowed Mr. Moore to pay a portion of his income towards rent with RHBA covering the remaining portion. Thus, this voucher would have allowed Mr. Moore to have stable, affordable housing.

24. Once he received his voucher, Mr. Moore immediately started searching for an apartment to rent. In August 2023, Mr. Moore saw an advertisement on Trulia.com for an apartment to rent at the Sea Breeze Apartments. Mr. Moore was excited about the opportunity of renting at Sea Breeze Apartments, as it met his housing needs, and the rental rate for the apartment was within the payment standard covered by Mr. Moore's Section 8 voucher.

25. Through the Trulia website, Mr. Moore responded to the advertisement, indicated his interest in renting an available unit, and provided his contact information. Shortly thereafter, Mr. Moore received a text message from Defendant Luis Reyes at (562) 209-2413, the telephone number for the Sea Breeze Apartments, which stated:

> Hi Desmond, No Section 8 and No dogs allowed. I can show you the apartment in person. Sea Breeze Apartments 401 & 407 Avenue G Redondo Beach, CA 90277.

26. Mr. Moore was shocked and upset by Defendant Reyes' overt discrimination in response to his rental inquiry. Mr. Moore immediately replied back:

> I have a section 8 voucher. Did you know that discrimination against Section 8 is prohibited under California law? I am still

> interested in the apartment if you are interested in complying with the law.

27. Thereafter, Mr. Moore received no further communications from the Sea Breeze Apartments.

28. Mr. Moore reported this discrimination to RBHA. While he continued his housing search, he was unable to secure housing and his voucher expired. Because of this, Mr. Moore has to wait to reapply to the RBHA voucher waiting list and faces another years-long wait before he can receive another voucher.

**2. DeAntiera McKnight**

29. DeAntiera McKnight, a 31-year-old African American person with two young children, also waited eight years for a Section 8 voucher. RBHA issued a Section 8 voucher to Ms. McKnight in June 2023.

30. Ms. McKnight was excited to finally receive her voucher after an eight year wait. The Section 8 voucher would allow her to secure housing at a rental rate that she could afford. At the time, she and her children were living at Ms. McKnight's mother's house, a small one-bedroom apartment, along with Ms. McKnight's siblings and their children—as the children grew older, space became a serious concern. Ms. McKnight also attended nursing school, and the crowded home made it more difficult to concentrate and work on her coursework.

31. After receiving her voucher, Ms. McKnight immediately started searching for an apartment to rent. In September 2023, Ms. McKnight saw an advertisement on Zillow.com for an apartment to rent at the Sea Breeze Apartments. The rental rate for the apartment was within the payment standard covered by her Section 8 voucher and offered Ms. McKnight and her children an opportunity to move into a home with more space.

32. Through the Zillow website, Ms. McKnight responded to this listing, indicated her interest in the apartment for rent, and provided her contact information.

Shortly thereafter, Ms. McKnight received an email from seabreeze@beachapts.net stating:

> I can show the 1 bedroom today Thursday afternoon? . . . No section 8 and no dogs allowed. 401 Ave G Redondo Beach.

33. Ms. McKnight was shocked and upset by this overt discrimination in response to her rental inquiry.

34. Ms. McKnight tried to rent the unit despite this discrimination by going in person to an open house to view the unit and complete an application. However, a leasing agent employed by Defendants discouraged her from applying because of her Section 8 voucher.

35. Ms. McKnight continued her housing search but could not secure housing before her voucher expired. Because of this, Ms. McKnight has to wait to reapply to the RBHA voucher waiting list again and faces another years-long wait before she can receive another voucher and try again.

**3. Adam Vickman**

36. Adam Vickman, a 40-year-old African American person with two children, also waited eight years for a Section 8 voucher. RBHA issued a Section 8 voucher to Mr. Vickman in July 2023.

37. After receiving his voucher, Mr. Vickman immediately started searching for an apartment to rent. In August 2023, Mr. Vickman saw an advertisement on Apartments.com for an apartment to rent at the Sea Breeze Apartments. The rental rate for the apartment was within the payment standard covered by Mr. Vickman's Section 8 voucher.

38. Through the website, Mr. Vickman responded to this listing, indicated his interest in the Sea Breeze apartment, and provided his contact information. Vickman received a response from seabreeze@beachapts.net confirming an

apartment for rent in September, adding "I will text you also." The email ended, "No Section 8, no dogs allowed." Mr. Vickman also received a text from Defendant Reyes from (562) 209-2413, the telephone number for the Sea Breeze Apartments, repeating the same information as in the email, including the statement, "No Section 8, no dogs allowed."

39. Mr. Vickman replied to Defendant Reyes, stating:

> May I ask you[r] reasoning for not accepting section 8. It is illegal in the state of California to deny an applicant based off of section 8.

In this text, Mr. Vickman also included links to two websites, including one from the California Apartment Association, explaining that Section 8 discrimination was unlawful in California.

40. Shortly thereafter, Defendant Reyes responded by text to Mr. Vickman from (562) 209-2413, that:

> I don't personally have a reason. I just follow company orders. Best of luck to you. I'm sure you have other buildings to look at.

41. Mr. Vickman reported this discrimination to RBHA and continued searching for an apartment rental that fits his voucher. Vickman eventually secured housing using his Section 8 voucher, but the amenities and location are inferior to those at the Sea Breeze Apartments.

**4. Lovie White**

42. Lovie White is a 42-year-old African American person with a disability.

43. Ms. White also waited eight years for a Section 8 voucher. RBHA issued a Section 8 voucher to Ms. White in June 2023.

44. Ms. White suffers from seizures caused by epilepsy. At the time she received the voucher, she lived with her sister and her sister's two children. Due to her disability, Ms. White cannot drive and relies on her mother and her sister to drive her to appointments, run errands, or to simply get out of the house to relax. Ms. White was hopeful that the voucher would allow her to move into an apartment that would allow her more privacy and less noise and that was in a walkable location that would make it easier for her to run errands or relax out of the house. Ms. White also requires a downstairs unit because it is easier for paramedics to move her on a stretcher after particularly bad seizures.

45. Immediately after receiving her voucher, Ms. White began searching for housing in Redondo Beach. In November 2023, Ms. White saw an advertisement on Zumper.com for an apartment to rent at the Sea Breeze Apartments. This unit was perfect for Ms. White—it was a downstairs unit, which would make it easier for paramedics to get to her with a stretcher, and it seemed disability friendly because it had ramps. As advertised by Defendants, it was also within walking distance of grocery stores, pharmacies, restaurants, and other amenities which would allow Ms. White to live more independently.

46. Through the website, Ms. White responded to this listing, indicated her interest in renting the unit, and provided her contact information. Shortly thereafter, she received an email from seabreeze@beachapts.net which stated:

> Hi Lovie, I can show you our 1 bedroom apartment December 1st. No dogs, no section 8 . . . Sea Breeze Apartments 401 & 407 Avenue G Redondo Beach, CA 90277 310-540-2363.

47. Ms. White also received a telephone call from a person who identified as a leasing agent for Sea Breeze Apartments. The agent confirmed that Sea Breeze had an apartment for rent and that the rental rate was within the payment standard

covered by Ms. White's Section 8 voucher. Ms. White told the agent that she wanted to apply for the apartment and that she had a Section 8 voucher. The agent replied that Sea Breeze Apartments did not accept Section 8. Ms. White asked if the agent's company had any other apartments available for rent. The agent replied no, none of the apartment's managed by the agent's company would accept a Section 8 tenant.

48. Ms. White was shocked and upset by the agent's overt discrimination. She reported the discrimination to RBHA and continued searching, unsuccessfully, for housing in Redondo Beach that fit her voucher. Ms. White was unable to find housing before her voucher expired. Because of this, Ms. White has to wait to reapply to the RBHA voucher waiting list again and faces another years-long wait before she can receive another voucher and try again.

**5. HRC Investigation**

49. The Southern California Housing Rights Center ("HRC") is a non-profit organization in Los Angeles. Its mission is to actively support and promote Fair Housing through education, advocacy, and enforcement. HRC works to identify barriers to Fair Housing and counteract and eliminate discriminatory housing practices throughout Southern California, including in Redondo Beach.

50. RBHA reported the discrimination committed by the owners and operators of the Sea Breeze Apartments to HRC. In response, HRC investigated See Breeze Apartments in August 2023 using Fair Housing testers. HRC assigned two testers—investigators posing as prospective tenants—to contact Sea Breeze Apartments, inquire about rental opportunities, and report what they were told. Tester A posed as a home seeker without a Section 8 voucher; Tester B posed as a Section 8 voucher holder .

51. Both testers contacted the Sea Breeze Apartments and spoke with Defendant Reyes, who identified himself as a Sea Breeze manager. Tester A, the prospective tenant without a Section 8 voucher, asked Defendant Reyes about apartments for rent. Defendant Reyes told Tester A that the Sea Breeze Apartments

had a vacancy for rent, that the apartment had superior amenities, and that Tester A would be eligible for a move-in discount. Tester B, the prospective tenant with a Section 8 voucher, asked Defendant Reyes about apartments for rent and disclosed that she had a Section 8 voucher. In response, Defendant Reyes hung-up the telephone on Tester B.

### C. Redondo Beach

52. Incorporated in 1892, Redondo Beach is one of the beach cities—Manhattan Beach, Hermosa Beach, and Redondo Beach—that make up the South Bay region of Los Angeles County.

53. Today, Redondo Beach's population is 67,750. Whites (including Hispanics) comprise 62% of the total population, Asians make up 14%, and African Americans are 3%. The remainder are mostly persons who identify as more than one race. The city contains 29,472 households spread across 30,999 housing units. Among the city's households, 52% are owner-occupied; 48% are renter-occupied.

54. As depicted in the following table, most White and Asian residents in Redondo Beach live in owner-occupied housing; most African Americans live in rental housing[1]:

| | City Total Pop by Race [#,%] | City Total Owner-Occupied Households by Race [#,%] | City Total Rental Households by Race [#,%] | City Total Households by Race (Owner-Occupied + Rental) [#,%] |
|---|---|---|---|---|
| White | 44,398, 62% | 10,625, 70.2% | 9,483, 66.1% | 20,108, 68.2% |

[1] This table excludes person who claims more than one race.

| | | | | |
|---|---|---|---|---|
| Asian | 10,257, 14.3% | 2,482, 16.4% | 1,493, 10.41% | 3,975, 13.4% |
| African American | 2,230, 3.1/% | 254, 1.7% | 620, 4.3% | 874, 3% |

55. The skewed distribution in owner-occupied dwellings between Whites and African Americans is accentuated by the uneven distribution of owner-occupied versus renter-occupied housing in Redondo Beach. The City is divided into two distinct communities, North Redondo Beach and South Redondo Beach. Each half of the city is unique. North Redondo Beach sits east of Manhattan Beach and Hermosa Beach with no direct beach access; it includes strip malls and industrial parks. South Redondo Beach is the prototypical "beach community" that provides direct beach access and includes King Harbor, Redondo Beach State Park, the Redondo pier, and the Esplanade and Rivera shopping areas. Most multifamily rental housing in the city is located in North Redondo Beach, not the southern part where the Sea Breeze Apartments is located as depicted in this map:

///

///

///

///

///

///

///

///

///

///

///

Hawthorne

Tech District Focus Area

Manhattan Beach

Lawndale

North Redondo Beach

Artesia Blvd. Focus Area

Galleria Focus Area

Hermosa Beach

Aviation Blvd. Focus Area

PCH North Focus Area

Community Comments on Recommended Land Use Plan (Comments Received on Social PinPoint (April 7 - April 11, 2021))

Focus Area

Type of Social PinPoint Comment

I have a suggestion

I like this land use

I would change this land use

NOTE: See attached spreadsheet to locate each comment by the key number denoted on the map.

Recommended Land Use Categories

Single-Family Residential

RSF: Single Family Residential (0-8.8 du/ac)

RSL: Small Lot Residential (0-17.5 du/ac)

Multi-Family Residential

RL: Residential Low (0-14.6 du/ac)

RM: Residential Medum (0-17.5 du/ac)

RMH: Residential Medium-High (0-23.3 du/ac)

RH: Residential High (0-30 du/ac)

Commercial

CN: Neighborhood Commercial (max 0.50 FAR | max 0.60 FAR in Artesia Blvd Focus Area)

CF: Commercial Flex (max 1.00 FAR)

CC: Coastal Commercial (FAR per Local Coastal Program)

Mixed-Use

MU-1: Mixed-Use (max 0.50/1.50 FAR; 0-30 du/ac)

MU-2: Mixed-Use (max 1.00/1.50 FAR; 0-35 du/ac)

MU-TC: Mixed-Use Transit Center (max 1.50 FAR; 0-30 du/ac)

Industrial

IF: Industrial Flex (max 1.00 FAR)

IC: General Industrial (max 1.00 FAR)

Public/Institutional/Open Space

PI: Public/Institutional

U: Public/Utility

OS: Parks and Open Space (max 0.05 FAR)

Areas Requiring Additional Consideration

Opt A: RH (0-30 du/ac) | Opt B: CN (max 0.50 FAR)

Overlay Districts

-R: Residential Overlay (30-45 du/ac)

Torrance Focus Area

PCH Central Focus Area

South Redondo Beach

PCH South Focus Area

Redondo Beach General Plan

Seabreeze Apartments

56. Accordingly, the City is segregated, especially South Redondo Beach. Segregation is measured using a dissimilarity index, the most widely accepted demographic measure of the evenness with which two groups are distributed across a geographic area. Since 2000, the dissimilarity index between Whites and African Americans in Redondo Beach has nearly doubled.

57. The existence of segregation in Redondo Beach is no accident and not unique in Los Angeles County. It is the result of several historical trends and practices that determined where African Americans could live in Los Angeles County. As discussed below, Defendants' "No Section 8 Policy" perpetuates those historical patterns of segregation.

**D. Segregation in the South Bay Cities**

58. California pioneered racial segregation in housing. The state's first real estate organization, the California State Realty Federation ("CSRF"), was founded in 1905 to promote the use of racial covenants to prohibit "sales or transfers to Negroes or Mongolians or persons of Asiatic blood" in White neighborhoods in California's fast-growing cities. By 1910, it was standard real estate practice to record a racial covenant with the title of every newly constructed dwelling in Los Angeles County. In 1917, the CSRF consolidated and renamed itself the California Real Estate Association ("CREA"). CREA's first public act was the issuance of a policy statement demanding passage of the state Alien Land Law under the call to arms, "the ownership of our soil must not pass to an alien race."

59. By 1924, CREA's Los Angeles Chapter openly encouraged its members to actively discriminate in the sale and rental of housing to maintain segregated neighborhoods throughout the South Bay of Los Angeles:

> The Los Angeles Realty Board recommends that Realtors should not sell property to other than Caucasian in territories occupied by them. Deed and Covenant Restrictions probably are the only

> way that the matter can be controlled; and Realty Boards should be interested. This is the general opinion of all boards in the state. Practically all subdivisions are provided with restrictions to protect them from future depreciation as far as possible through encroachment of a foreign race … Attention is called to the fact that court records show that most of the crime in this country is committed by members of these races.

By 1940, 80% of single-family homes in Los Angeles County had restrictive covenants that barred their ownership or occupancy by African Americans.

60. These discriminatory practices resulted in the complete segregation of South Redondo Beach by 1939, as reflected in the Area Reports of the Home Owners' Loan Corporation ("HOLC"), the New Deal agency charged with appraising and purchasing distressed mortgages to stabilize the banking system. HOLC mapped Los Angeles and rated each neighborhood based, in part, on the rate of "infiltration" of "foreign families" and "negroes" in each neighborhood. Each HOLC report consisted of a standard form. Part One asks for the area population's class and race. It included two call-out boxes, one for percent "foreign families," the other for "negro," followed by blank to indicate whether nonwhites had "infiltrated" the neighborhood.

61. The HOLC Area Report for South Redondo Beach, dated May 11, 1939, stated:

> POPULATION: Foreign Families: 0% . . . Negro: 0%. Shifting or Infiltration: None apparent.
> DESCRIPTION AND CHARACTERISTICS OF AREA: Land improved 70%. Deed restrictions, which expire in about 15 years, provide for minimum improvement of $3500 and racial

> protection. Zoning conforms to deed restrictions. Conveniences are all readily available, including interurban transportation. This area is approximately 40 years old and was developed as a beach home district. It is the best residential section of Redondo Beach.

62. The HOLC Area Report for North Redondo Beach (which also included Hermosa Beach), dated March 21, 1939, stated:

> POPULATION: Foreign Families: 15%. Nationalities: Mexicans (some Japs). Negro: 0%. Shifting or Infiltration: Continued infiltration of subversive racial elements.
>
> DESCRIPTION AND CHARACTERISTICS OF AREA: Zoning varies and is generally inadequate. Conveniences are all reasonably available including interurban transportation. The beach section of this area started to develop some 45 years ago and has been slowly creeping up the hillside ever since. This is a typical beach resort area, and is extremely heterogeneous both as to population and improvements.

63. Although outlawed by the Supreme Court in 1948, racial covenants—coupled with overt racial steering—remained so commonplace in the South Bay Cities that by the 1960s, the South Bay became ground-zero for protests to stop housing discrimination.

64. Between 1962 and 1963, CORE—the Committee of Racial Equality—engaged in extensive Fair Housing testing of housing providers in the South Bay and the picketing of real estate firms and developers who discriminated against African American home buyers. Better known for its 1961 Freedom Rides throughout the southern United States, CORE was active in Los Angeles throughout the 1950s and

1960s. It integrated shops at Union Station, sent secret shoppers to test major hotels in Los Angeles for race discrimination in 1957, and led sit-ins at downtown LA department stores in 1960 for refusing to serve African Americans.

65. CORE's picketing in 1962-1963 in the South Bay led to the arrest of dozens of its members. Known by advocates as the Battle for the South Bay, these protests prompted passage of the Rumford Act, also known as the California Fair Housing Act of 1963, the progenitor of the federal Fair Housing Act, and the country's first Fair Housing law since the Civil Rights Act of 1866. In response to the Rumford Act, the California Real Estate Association sponsored Proposition 14 of 1964, which repealed the Rumford Act and amended the California Constitution to permit private housing discrimination. Proposition 14 was declared unlawful by the California and United States Supreme Courts in 1966 and 1967, respectively.

66. But for the South Bay, especially South Redondo Beach, the pattern of segregation was already entrenched by 1963. White Angelenos overwhelmingly supported the passage of Prop 14. Resistance to integration increased throughout the South Bay in the wake of the Watts Riot of 1965. Today, the census tracts that comprise South Redondo Beach are ranked "highly segregated" between Whites and African Americans. That is especially true of the neighborhood around the Sea Breeze Apartments.

**E. The Sea Breeze Apartments**

67. Built in 1960, the Sea Breeze Apartments is an attractive, 56-unit rental complex, located in South Redondo Beach. Its design and layout are typical of similar beach community complexes constructed during that time period, as shown below:

///

///

///

///




68. The Sea Breeze Apartments is located near the Rivera Village, a downtown shopping area, and less than one mile from the beach, as depicted on this map:




69. Defendants tout the desirability of the Sea Breeze's location in their advertisements, noting that the Sea Breeze Apartments is "only a 12 minutes walk to the beach! Quiet friendly building in a safe community."

///

///

**F. The Disparate Impact of Defendants' "No Section 8 Policy"**

70. Defendants' "No Section 8 Policy" is housing discrimination because of race. The policy has the purpose and effect of discriminating against African American renters, like the Plaintiffs in the case at bar. It also has the effect of creating and perpetuating racial segregation in the Sea Breeze Apartments and its neighborhood.

**1. Defendants' "No Section 8 Policy" actually and predictably results in disparate impact on Redondo Beach's Black rental households because of race**

71. The following table lists the distribution of Redondo Beach's White and Black[2] households by race and their number of Section 8 vouchers.

| ***Race*** | ***Total Households by Race*** | ***Rental Households by Race*** | ***Section 8 Vouchers by Race*** |
|---|---|---|---|
| White | 20,108 | 9,483 | 298 |
| Black | 874 | 620 | 130 |
| Totals [White + Black Households] | 20,982 | 10,103 | 428 |

72. These data establish that Defendants' "No Section 8 Policy" has a significant, adverse, disparate effect on Redondo Beach's Black rental households in comparison to its White rental households:

a. A larger proportion of Black households are adversely affected by discriminatory rental practices than White households: 71%

[2] The terms "African American" and "Black" are used interchangeably in this Complaint.

of Redondo Beach's Black households are renters, while 47% of Redondo Beach's White households are renters;

b. A significantly larger proportion of Black renters are adversely affected by a "No Section 8 Policy" than White renters: 21% of Redondo Beach's Black rental households are Section 8 voucher recipients, while only 3% of Redondo Beach's White rental households are Section 8 voucher recipients; and,

c. Thus, the discriminatory effect of Defendants' "No Section 8 Policy" falls much more harshly on all Black households in comparison to all White households: of Redondo Beach's total households based on these races, 14.9% of all Black households rely on Section 8 vouchers, while only 1.5% of all White households rely on Section 8 vouchers.

73. As a result, Defendants' "No Section 8 Policy" has a robust, statistically significant adverse effect because of race; specifically:

a. Defendants' "No Section 8 Policy" excludes Redondo Beach's Black rental households at a rate that is 6.7 times higher than it excludes Redondo Beach's White rental households; and,

b. Defendants' "No Section 8 Policy" excludes Redondo Beach's Black households, as a group, at a rate that is 10 times higher than it excludes Redondo Beach's White households, as a group.

**2. Defendants' "No Section 8 Policy" actually and predictably creates, increases, reinforces, or perpetuates segregated housing patterns because of race.**

74. The neighborhood where the Sea Breeze Apartments is located is predominantly White, and much more so than Redondo Beach as a whole, as reflected in the following table:

///

| *Race* | *Sea Breeze's Block Group[3] 2 Population by Race* | *Sea Breeze's Census Tract 6214 Population by Race* | *City of Redondo Beach Population by Race* |
|---|---|---|---|
| Total[4] | 1,149 | 3,974 | 67,750 |
| Percent Black | 1.1% | 1.7% | 3.3% |
| Percent White | 87.6% | 86% | 65.5% |

75. Given the disproportionate rate at which Redondo Beach's Black and White rental households use Section 8 vouchers, Defendants' "No Section 8 Policy" significantly and robustly creates and perpetuates racial segregation in the Sea Breeze Apartments and the immediate neighborhood where that property is located:

a. 21% of Redondo Beach's Black rental households are Section 8 voucher recipients, while only 3% of Redondo Beach's White rental households are Section 8 voucher recipients;

b. Defendants' "No Section 8 Policy" operates to disproportionately exclude Black rental household from the Sea Breeze Apartments and its neighborhood and to disproportionately favor White rental households in the rental of housing;

c. Defendants' "No Section 8 Policy" creates, increases, reinforces, or perpetuates segregated housing patterns that already exist in the Sea Breeze's neighborhood; and,

[3] A block group is a subdivision of a census tract

[4] These totals exclude persons whose race is Asian only and person who identify as more than one race.

d. Defendants' "No Section 8 Policy" significantly and directly causes racial segregation by automatically excluding Black rental households at a rate that is nearly 7 times greater than the exclusion of White rental households.

**3. Section 8 is a proxy for Black rental households; accordingly, Defendants' "No Section 8 Policy" is disparate treatment because of race.**

76. On the basis of national, state, county, and city data, Black households participate at significantly higher rates in the Section 8 voucher program than their proportion of total renter households.

77. On information and belief, Defendants are aware of the over-representation of Black rental households in the Section 8 voucher program. Defendants' "No Section 8 policy" is a method by which Defendants seek to exclude Black applicants from qualifying to rent dwellings at the Sea Breeze Apartments.

**G. Injuries and Relief**

78. As a proximate result of Defendants' "No Section 8 Policy," each Plaintiff suffered injury including, but not limited to, emotional distress, anxiety, humiliation, frustration and insult, including the attendant bodily injuries, out-of-pocket expenses and losses, lost housing opportunities, and violation of their civil rights. Accordingly, each Plaintiff is entitled to compensatory damages.

**1. Punitive Damages**

79. The unlawful and discriminatory acts and practices alleged in this Complaint were intentionally, knowingly, and maliciously committed by Defendants, including their reckless disregard for each Plaintiff's rights under federal and state laws.

**2. Declaratory Relief**

80. There now exists an actual controversy between the parties regarding Defendants' duties under state Fair Housing laws. Accordingly, each Plaintiff is entitled to declaratory relief under their federal and state law claims including, but

not limited to, 28 U.S.C. § 2201 as well as Rule 57 of the Federal Rules of Civil Procedure.

**3. Injunctive Relief**

81. Unless enjoined, Defendants will continue to engage in the unlawful acts and the pattern or practice of discrimination described in this Complaint. Plaintiffs have no adequate remedy at law. Plaintiffs are now suffering and will continue to suffer irreparable injury from Defendants' misconduct unless relief is provided by this Court. Accordingly, each Plaintiff is entitled to injunctive relief under their federal and state law claims including, but not limited to, 28 U.S.C. § 2202 as well as Rule 65 of the Federal Rules of Civil Procedure.

## IV. CLAIMS

### A. First Claim: Federal Fair Housing Act

**[All Plaintiffs vs All Defendants]**

82. Plaintiffs reallege and incorporate by reference each preceding paragraph.

83. The Sea Breeze Apartments is a "dwelling" under the Fair Housing Act, 42 U.S.C. § 3602(b).

84. Each Defendant injured each Plaintiff in violation of the federal Fair Housing Act by committing one or more of the following discriminatory housing practices:

a. 42 U.S.C. § 3604(a), by refusing to negotiate for the rental of, or otherwise making unavailable or denying a dwelling to any person because of race, color, or national origin, including:

  i. failing to accept or consider a bona fide offer because of race, color, or national origin, 24 C.F.R. § 100.60(b)(1);

  ii. using different qualification criteria or applications, or rental standards or procedures, such as income standards, application requirements, application fees, credit analysis

or rental approval procedures or other requirements, because race, color, or national origin, 24 C.F.R. § 100.60(b)(4);

iii. restricting or attempting to restrict the choices of a person by word or conduct in connection with seeking, negotiating for, renting a dwelling so as to perpetuate, or tending to perpetuate, segregated housing patterns, or to discourage or obstruct choices in a community, neighborhood or development because of race, color, or national origin, 24 C.F.R. § 100.70(a);

iv. discouraging any person from inspecting or renting a dwelling because of race, color, or national origin, or because of the race, color, national origin of persons in a community, neighborhood or development, 24 C.F.R. § 100.70(b)(1); and,

v. communicating to any prospective renter that he or she would not be compatible with existing residents of a community, neighborhood or development because of race, color, or national origin, 24 C.F.R. § 100.70(b)(3).

b. Representing to any person because of race, color, or national origin that any dwelling is not available for inspection or rental when such dwelling is in fact so available, including:

i. indicating through words or conduct that lease provisions or policies which purport to restrict the rental of dwellings because of race, color, or national origin preclude the rental of a dwelling to a person, 24 C.F.R. § 100.80(b)(2);

ii. enforcing lease provisions or policies which preclude the rental of a dwelling to any person because of race, color,

or national origin, 24 C.F.R. § 100.80(b)(3);

iii. limiting information, by word or conduct, regarding suitably priced dwellings available for inspection or rental, because of race, color, or national origin, 24 C.F.R. § 100.80(b)(4); and,

iv. providing false or inaccurate information regarding the availability of a dwelling for rental to any person, including testers, regardless of whether such person is actually seeking housing, because of race, color, or national origin, 24 C.F.R. § 100.80(b)(5).

c. 42 U.S.C. § 3617, by interfering with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected under the federal Fair Housing Act.

85. Each Plaintiff will prove that each Defendant is liable, 24 C.F.R. § 100.7, for one or more of the discriminatory housing practices listed above under either the disparate treatment theory, adducing direct and circumstantial evidence of each Defendant's discriminatory intent or purpose, or under the disparate impact theory, adducing evidence of the disparate impact of Defendants' "No Section 8 Policy."

86. Each Plaintiff was injured or threatened with injury by Defendants' discriminatory housing practices; accordingly, each Plaintiff is an "aggrieved person," 42 U.S.C. § 3602(i), entitled to relief under the Fair Housing Act, 42 U.S.C. § 3613(a), including compensatory and punitive damages and declaratory and injunctive relief, 42. U.S.C. § 3613(c).

///

///

**B. Second Claim: California Fair Employment and Housing Act**

**[All Plaintiffs v. All Defendants]**

87. Plaintiffs herein reallege and incorporate by reference all the preceding paragraphs of this Complaint.

88. The Sea Breeze Apartments is a "housing accommodation" subject to FEHA, Cal. Gov't. Code § 12927(d).

89. Each Defendant is an "owner" subject to FEHA, Cal. Gov't. Code § 12927(e).

90. Under FEHA, "source of income" includes federal housing assistance vouchers issued under Section 8 of the United States Housing Act of 1937 (42 U.S.C. § 1437f).

91. Each Defendant injured each Plaintiff in violation of FEHA by committing one or more of the following discriminatory housing practices:

a. each discriminatory housing practice alleged in violation of the federal Fair Housing Act, as alleged in Plaintiffs' first claim, Cal. Gov't. Code § 12955.6;

b. discriminating against any person because of the race, color, national origin, ancestry, or source of income of that person, Cal. Gov't Code § 12955(a);

c. making, printing or publishing, or causing to be made, printed, or published any notice, statement, or advertisement, with respect to the rental of a dwelling that indicates any preference, limitation, or discrimination based on source of income or an intention to make that preference, limitation, or discrimination, Cal. Gov't. Code § 12955(c);

d. violating the Unruh Civil Rights Act, Cal. Civ. Code § 51, by discriminating against any person on the basis of race, color, national origin, ancestry, or source of income, Cal. Gov't. Code

§ 12955(d);

e. aiding, abetting, inciting, compelling, or coercing the doing of any of the acts or practices declared unlawful under Cal. Gov't. Code § 12955, or attempting to do so, Cal. Gov't. Code § 12955(g);

f. otherwise making unavailable or deny a dwelling based on discrimination, Cal. Gov't. Code § 12927(c)(1), because of race, color, national origin, ancestry, or source of income, Cal. Gov't. Code § 12955(k);

g. discriminating through private land use practices, decisions, and authorizations because of race, color, national origin, ancestry, or source of income, including but not limited any practice, decision, or authorization:

i. that denies, restricts, conditions, adversely impacts, or renders infeasible the enjoyment of residence, tenancy, or any other land use benefit related to housing opportunities, 2 C.C.R. § 12161(b)(1);

ii. that makes housing opportunities unavailable or denies dwellings to individuals or intended occupants of dwellings, 2 C.C.R. § 12161(b)(2);

iii. that creates, increases, reinforces, or perpetuates segregated housing patterns, independently of the extent to which it produces a disparate effect on protected classes, 2 C.C.R. § 12161(b)(12)

92. Each Plaintiff will prove that each Defendant is liable, 2 C.C.R. § 12010, for one or more of the discriminatory housing practices listed above under either the disparate treatment theory, adducing direct and circumstantial evidence of each Defendant's discriminatory intent or purpose, Cal. Gov't. Code § 12955.8(a),

or under the disparate impact theory, adducing evidence of the disparate impact of Defendants' "No Section 8 Policy," Cal. Gov't. Code § 12955.8(b), or both. Plaintiffs will prove that each Defendant is liable for violation of Cal. Gov't Code § 12955(c) under the ordinary reader or listener standard, 2 C.C.R. § 12050(g).

93. Each Plaintiff was injured or threatened with injury by Defendants' discriminatory housing practices; accordingly, each Plaintiff is an "aggrieved person," Cal. Gov't. Code § 12927(b), entitled to relief under FEHA, Cal. Gov't. Code § 12989.1, including compensatory and punitive damages and declaratory and injunctive relief, Cal. Gov't. Code § 12989.2.

**B. Third Claim: Unruh Civil Rights Act**

**[All Plaintiffs v. All Defendants]**

94. Plaintiffs reallege and incorporate by reference all the preceding paragraphs of this Complaint.

95. The Sea Breeze Apartments and each of the Defendants is a "business establishment" under the Unruh Civil Right Act, Cal. Civ. Code § 51.

96. Defendants, and each of them, injured Plaintiffs in violation of the Unruh Act, Cal. Civ. Code § 51 *et seq*, by discriminating in the operation of a business establishment against each of them on the basis of personal characteristics. Plaintiffs will prove that each Defendant is liable, for violation of the Unruh Civil Rights Act under a disparate treatment theory.

97. Pursuant to the Unruh Act, each Plaintiff is an "aggrieved party," Cal. Civ. Code § 52(e), entitled to relief according to proof pursuant to Cal. Civ. Code § 52(a), including statutory damages of up to three times their actual damages as determined by the trier of fact, but no less than $4,000 for each violation.

**C. Fourth Claim: California Unfair Competition Law**

**[All Plaintiffs v. All Defendants]**

98. Plaintiffs herein reallege and incorporate by reference all the preceding paragraphs of this Complaint.

99. The rental of dwellings is a "business act or practice" under Cal. Bus. & Prof. Code § 17200.

100. Defendants, and each of them, injured by committing the following unfair or unlawful business practices in violation of Cal. Bus. & Prof. Code § 17200:

a. Unfair or unlawful practices, including but not limited to, violation of each of the federal, state and local statutory provisions alleged herein; or,

b. Unfair or discriminatory advertisement, as alleged herein.

101. As a proximate results of Defendants' unfair or unlawful business acts or practices, each Plaintiff suffered a loss of money or property or both within the meaning of Cal. Bus. & Prof. Code § 17204, including the loss of housing and the value of their Section 8 vouchers.

102. Accordingly, each Plaintiff is entitled relief according to proof pursuant to Cal. Bus. & Prof. Code §§ 17204-17208.

## V. RELIEF

Wherefore, Plaintiffs pray for the following relief from the Court:

103. For an order (a) enjoining Defendants and their agents, employees, and all persons acting under or in concert with Defendants from refusing to accept Housing Choice Vouchers as payment for rental of housing accommodations and (b) requiring Defendants to take affirmative action to provide equal housing opportunities to all tenants and prospective tenants regardless of their source of income.

104. For declarations that Defendants have violated the provisions of applicable Fair Housing laws;

105. For actual and compensatory damages, according to proof;

106. For statutory damages and special damages, according to proof;

107. For restitution, according to proof;

108. For punitive or exemplary damages, according to proof;

109. For reasonable attorneys' fees provided by law;

110. For an award of costs of suit herein incurred including expert witness fees pursuant to California Government Code § 12989.2; and,

111. For such other and further relief as the Court may deem proper.

Dated: 02/11/2025 **HOUSING RIGHTS CENTER**

//s//Rodney Leggett
RODNEY LEGGETT
ZACHARY FREDERICK
JAVIER BELTRAN

Dated: 02/11/2025 **BRANCART & BRANCART**

//s// Christopher Brancart
CHRISTOPHER BRANCART